IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANDRE L. HART,

       Plaintiff,

   v.

J. CELAYA, et al.,

       Defendants.

_____/

No. C 06-02519 CW (PR)

ORDER GRANTING
DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT
(Docket nos. 34, 81)

United States District Court
For the Northern District of California

    Plaintiff Andre L. Hart is a state prisoner, incarcerated at Salinas Valley State Prison (SVSP) when he filed this pro se civil rights action under 42 U.S.C. § 1983. He alleges that, on March 10, 2005, Defendants Alfred Aguirre, Frank Colburn, Joseph Celaya, Ernie Camarena and Christopher Salopek were involved in an incident in which they (1) used excessive force against Plaintiff and (2) were deliberately indifferent to his serious medical needs. The incident entailed Plaintiff's placement in a holding cell, exposure to pepper spray, and subsequent decontamination.

    All Defendants move for summary judgment. Plaintiff opposes Defendants' motions. For the reasons discussed below, the Court GRANTS Defendants' motions.

PROCEDURAL BACKGROUND

On April 11, 2006, Plaintiff filed his complaint against Defendants Aguirre, Colburn, Celaya, Camarena, Salopek, E. Pulido and Does.  On November 1, 2006, the Court issued a screening order finding that Plaintiff had alleged a cognizable claim of excessive force against Defendants Celaya, Colburn, Camarena, Salopek and Aguirre; and that he had alleged a cognizable claim of deliberate indifference to his medical needs against Defendants Colburn, Camarena, Salopek and Aguirre.  The Court dismissed without prejudice Plaintiff's claims against Defendants Pulido and Does, and dismissed his official capacity claims.  The Court ordered the complaint served on Defendants.

Defendants Celaya, Camarena and Salopek moved for summary judgment (docket no. 34).  Later, Defendants Aguirre and Colburn moved for summary judgment (docket no. 81).  Plaintiff opposed both motions.  Defendants Celaya, Camarena and Salopek replied.

On July 12, 2007, the Court referred the case to a magistrate judge for discovery purposes.  The magistrate judge ordered Defendants to produce Plaintiff's medical and central file for Plaintiff's review.  The magistrate judge also ordered Defendants to produce several documents for in camera review, as follows: (1) any complaints claiming any Defendant used improper or excessive force from January 1, 2001 to January 1, 2006; (2) SVSP policies and operational procedures related to the use of force; (3) Use of Force Critique for the incident, number SVP-FC7-05-03-0136; and (4) Modification Order, corresponding memorandum, and Confidential Supplement for the inmate appeal, log number SVSP-D-

2

05-01465.  Because the magistrate judge determined that the submitted documents would qualify for an "attorneys' eyes only" protective order, and because Plaintiff is proceeding pro se, the Court has reviewed the documents and has taken into consideration any information supporting Plaintiff's claims.

FACTUAL BACKGROUND

I.   SVSP Policies

According to SVSP policy, "if an inmate is accused of exposing himself or masturbating in the presence of a prison official or medical professional, then he is promptly rehoused to Administrative Segregation [ad seg] and will be issued a Rules Violation Report for sexual harassment."[1]  (Celaya Decl. ¶ 8; Mensing Decl. ¶ 3.)

Prior to being placed in ad seg, inmates are placed in holding cells.  In order to check for contraband items in their body cavities and clothing, inmates must submit to an unclothed body search.  (Camarena Decl. ¶ 5.)  An unclothed body search entails "stripping out of all your clothes, run[ning] your fingers through your hair, through your mouth, lifting your genitals, turning around, coughing, lifting up the heel [sic] of your feet, totally naked, while [prison officials] stand there and observe you and shine a flashlight."  (Pl.'s Depo. 127.)  Once an inmate is secured in a holding cell, prison officials must complete a holding cell log where they document the inmate's welfare every thirty minutes.

---

[1]Indecent exposure, while in prison, constitutes a misdemeanor offense under the California Code of Regulations and is subject to possible criminal prosecution.  (Celaya Decl. ¶ 8.)  See 15 Cal. Code Regs. § 3007 ("Inmates may not participate in illegal sexual acts").

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

(Camarena Decl. ¶ 5.)  Even if an inmate's hands have been exposed to Oleoresin Capsicum (OC) pepper spray, he must still submit to an unclothed body search for contraband.  (Salopek Decl. ¶ 6.)

The OC solution used at SVSP is called MK-9 Magnum Aerosol Pepper Projector.  (Gifford Decl. ¶ 2.)  The decontamination procedure listed on the label reads as follows:

> Remove subject from contaminated area and position subject in an area of fresh air. . . . [C]ontinue to monitor subject throughout the decontamination process.  When available, allow the subject to flush their eyes with copious amounts of fresh running water.

(Id. ¶ 3.)

II.  Plaintiff's March 10, 2005 Placement in Administrative Segregation and Related Incidents

While at SVSP, Plaintiff received at least three Rules Violation Reports related to sexual misconduct.  On July 24, 2004, Plaintiff was found guilty of indecent exposure for masturbating naked in front of an SVSP Medical Technical Assistant (MTA) on June 24, 2004.  On April 26, 2005, Plaintiff was found guilty of sexual harassment, related to indecent exposure, for exposing himself to an SVSP nurse on March 10, 2005.  On November 28, 2005, Plaintiff received a Rules Violation Report for masturbating in front of an SVSP medical technician.  Plaintiff's March 10, 2005 violation gave rise to the alleged incidents for which he asserts this claim.

On March 10, 2005, at about 10:00 am, Plaintiff exposed himself to a nurse,[2] while she was distributing medications to

_____

[2]One day prior, on March 9, 2005, Plaintiff had pressed a note to the window of his cell door and told the nurse that if she did not read it, he would "be acting like [he] did on B-Yard."  (SVP-FC7-05-03-0136 Incident Report at 2.)  While housed in Facility B, Plaintiff had masturbated in the nurse's presence.  (Id.)

4

**United States District Court**
For the Northern District of California

inmates.   The nurse informed Sergeant Joshua Mensing, the supervising officer for the facility in which Plaintiff was housed. (Ugaz Decl. Ex. D, Rules Violation Report SVP-FC7-05-03-0136.)   At about 11:00 am, Sgt. Mensing ordered Defendant Camarena to escort Plaintiff from his cell to the Program Office, in preparation for placing Plaintiff in ad seg.  (Mensing Decl. ¶ 3.)  Defendant Camarena told Plaintiff that he was escorting him to the Program Office.  Plaintiff complied with the instructions from Defendant Camarena, who placed him in a holding cell in the health services annex.  (Camarena Decl. ¶ 6.)  At 11:30 am, once Plaintiff was secured in a holding cell, MTA Pulido completed a preliminary medical evaluation; she found that he had no injuries and told him that he was to be placed in administrative segregation.  (Pl.'s Depo. 97; Lee Decl. Ex. A.)  Shortly thereafter, Defendant Camarena ordered Plaintiff to submit to an unclothed body search, and Plaintiff refused.  (Pl.'s Depo. 99-101.)  Defendant Camarena explained that all inmates in holding cells must submit to an unclothed body search, and Plaintiff again refused, demanding to speak to a superior officer.  (Id.)

Defendant Camarena then left the holding area to inform Sgt. Mensing that Plaintiff was secured in a holding cell, but that he refused to submit to the body search.  Defendant Camarena and Sgt. Mensing returned to the holding cell area, and Sgt. Mensing ordered Plaintiff to comply with the search.  (Mensing Decl. ¶ 5.) Plaintiff became "progressively more defiant, agitated, and loud." (Id.)  He refused to comply until he could speak with Defendant Celaya.  (Pl.'s Depo. 104.)  Sgt. Mensing then left the holding area to inform Defendant Celaya, the supervising facility

lieutenant, that Plaintiff refused to submit to the search. (Mensing Decl. ¶ 5.)

At approximately 1:00 pm, Defendants Celaya and Salopek and Sgt. Mensing joined Defendant Camarena in the holding cell area. (Celaya Decl. ¶ 4; Salopek Decl. ¶ 3.)  Defendant Celaya ordered Plaintiff to submit to the unclothed body search, and Plaintiff refused.  (Pl.'s Depo. 116.)  Plaintiff and Defendant Celaya were yelling back and forth with Plaintiff demanding to see the facility captain, while pushing up against and shaking the door of his cell. (Pl.'s Depo. 115; Celaya Decl. ¶ 4.)  Plaintiff testifies that he was "irate," and "yelling" at Defendant Celaya.  (Pl.'s Depo. 100-13.)  Defendant Celaya refused to retrieve the facility captain, and Plaintiff continued to rattle the door of his holding cell. (Ugaz Decl. Ex. F, Incident Report.)  Defendants demanded that he stop.  Plaintiff testifies that Defendant Celaya yelled, "I'm giving you a direct order to strip out, if you don't I'll spray you with a chemical agent and strip you out."  (Pl.'s Depo. 112.) Plaintiff shouted, "I don't give a fuck about your program.  Spray me, because I am not going to strip out." (Id. at 115.) Defendants believed that Plaintiff might "seriously hurt himself." (Camarena Decl. ¶ 8; Celaya Decl. ¶ 4; Salopek Decl. ¶ 4.)  Sgt. Mensing was also concerned that Plaintiff might break the cell door and pose a danger to others.  (Mensing Decl. ¶ 6.)

Plaintiff testifies that Defendant Celaya ordered that Plaintiff be pepper sprayed.  (Pl.'s Depo. 113.)  Shortly thereafter, for thirty to sixty seconds, Sgt. Mensing sprayed

United States District Court
For the Northern District of California

Plaintiff with a canister[3] of OC, through the top of Plaintiff's cell door. (Pl.'s Depo. 118; Mensing Decl. ¶ 6.)  Plaintiff admits that neither Defendant Salopek nor Defendant Celaya sprayed him with OC. (Pl.'s Depo. 122.)  At the time he was sprayed, Plaintiff was wearing jeans, a "state blue" shirt, a t-shirt, tennis shoes, socks and a head covering, and he was standing in the corner of his cell with his back to the spray. (Id. at 119.)  Plaintiff was sprayed at approximately 12:45 pm. (Pl.'s Decl. Ex. N.)

Plaintiff testifies that, after he was sprayed, Sgt. Mensing and Defendants Celaya, Camarena and Salopek left the holding cell area and closed the door. (Id. at 125.)  Before they left, Defendant Celaya said, "[L]et me know when you are ready to strip out." (Id.)  Plaintiff testifies that he was trying to be "macho" by not coughing, but "eventually it got the better of" him and he started to cough and choke. (Id.)  He states that he yelled that he was ready to strip out, but that Defendant Celaya tormented him by twice asking him to yell louder. (Id. at 125-26.)  Plaintiff testifies that three times he had to yell that he would strip out before Defendant Celaya said, "Okay do it." (Id. at 126.)  Then, Defendants Camarena and Salopek re-entered the holding cell room to conduct the strip search. (Id.)  Plaintiff testifies that approximately five minutes elapsed between the time he was sprayed with OC and the time Defendants Camarena and Salopek opened the

---

[3]The record refers to two canisters of OC.  Plaintiff testifies that Defendant Celaya sprayed him for about three seconds through the cuff port in the cell door, but that his body was blocking it; whereas Sgt. Mensing declares that he first attempted to use one canister of OC that was too depleted.  However, both sides agree that Sgt. Mensing sprayed the effective canister of OC through the top of Plaintiff's cell door.

United States District Court
For the Northern District of California

1    door of his cell.[4]  (Id. at 125.)

2         Plaintiff then submitted to an unclothed body search in

3    compliance with orders from Defendants Camarena and Salopek.  In

4    his complaint, Plaintiff alleges that, because his hands were

5    saturated with chemical spray, his genitals burned when he lifted

6    them for the body search.  The entire body search lasted two to

7    three minutes.  (Id. at 127.)

8         After the body search, Plaintiff complied with instructions

9    from Defendant Salopek, who placed him in handcuffs, opened the

10   cell door and ordered him to kneel.  Plaintiff testifies that,

11   before he was able to kneel, Defendant Camarena twisted his right

12   wrist unnecessarily and attempted to trip him, after which he went

13   down on his knees.  (Id. at 128-31.)  Plaintiff also testifies

14   that, once he was kneeling, Defendant Camarena pushed him into the

15   corner of a holding cell for ten to fifteen seconds, causing him to

16   injure his shoulder.  (Id. at 131-34.)  While Plaintiff was down,

17   Defendants Camarena and Salopek placed leg restraints on him.[5]

18   Plaintiff testifies that, as Defendants Camarena and Salopek

19   escorted him to an outdoor area for decontamination, Defendant

20   Camarena continued to subject him to "rough handling" by twisting

21

22   _____

23        [4]Defendants declare that, after Plaintiff was sprayed, they
     stepped into an annex outside of the holding cell area for a minute
24   or two, until they heard Plaintiff cough and say that he was ready
     to comply with an unclothed body search; then, they immediately re-
25   entered the holding cell area.  (Camarena Decl. ¶¶ 9-10; Celaya
     Decl. ¶ 6; Salopek Decl. ¶¶ 5-6.)

26
         [5]In his complaint, Plaintiff alleges that Defendant Celaya
27   directed Defendants Camarena and Salopek to put leg restraints on
     Plaintiff.  In his deposition, Plaintiff states, instead, that
28   Defendant Salopek directed Defendant Camarena to "grab the leg
     irons."  (Pl.'s Depo. 133.)

United States District Court
For the Northern District of California

his wrist and jerking his arm.[6]  (Id. at 138.)  Plaintiff admits

that Defendant Salopek, who was holding his left arm, did not

subject him to rough handling.  (Id. at 139.)  According to the

holding cell log, Plaintiff spent a total of one and a half hours

in the holding cell.  (Pl.'s Decl. Ex. I.)

Once outside, Defendants Camarena and Salopek ordered

Plaintiff to kneel in a corner area about three feet from the wall

of the health services annex.  (Id. at 138, 144.)  Plaintiff was

wearing boxer shorts.  Plaintiff recalls that it was close to

ninety degrees outside, and that he was forced to kneel on a hot

surface[7] with his back exposed to the heat of the sun.  (Pl.'s

Depo. 142-45.)  Defendants state that they asked Plaintiff to

kneel, rather than stand, because he had been agitated earlier and

they felt they needed more control over him.  (Salopek Decl. ¶ 8;

Camarena Decl. ¶ 11.)  Further, they did not take Plaintiff to a

shower, because there was not one in the building, and because

decontamination is achieved with "copious amounts of air," whereas

water provides only temporary relief.  (Id.)  Also, Plaintiff might

have refused to exit a locked shower stall.  (Mensing Decl. ¶ 8.)

---

[6]Sgt. Mensing observed Defendants Camarena and Salopek while
they placed Plaintiff in handcuffs and leg irons, and he followed
them as they escorted Plaintiff outside, but he did not assist in
the decontamination process.  (Mensing Decl. ¶ 7.)  He declares
that Defendant Camarena did not attempt to trip Plaintiff, push him
into the side of a cell, twist his arms, or taunt him.  (Id.)

[7]Plaintiff testifies that the surface was "asphalt."  (Pl.'s
Depo. 145.)  Defendant Camarena declares that it was "light
colored" cement.  (Camarena Decl. ¶ 11.)  Photographs of the
outdoor area indicate that at least three feet of light colored
cement abut the wall of the health services annex.  (Salao Decl.
Exs. H-I.)

United States District Court
For the Northern District of California

1     Plaintiff testifies that his knees began to blister, but

2  Defendants refused his request for something to put under his

3  knees.[8]  (Pl.'s Depo. 145.)  He testifies that he felt like he was

4  going to "pass out," but that Defendants Salopek, Colburn, Camarena

5  and two other prison officials, who were standing in a group making

6  "snide remarks," refused his request to see an MTA,[9] telling him

7  that it was just the effects of the spray.  (Id. at 148.)

8  Plaintiff also claims that Defendant Colburn told a story about

9  trapping and cooking lobster and that he compared Plaintiff to a

10  lobster.[10]  (Id. at 150-51.)  Defendant Camarena recalled Plaintiff

11  stating that he was "burning," but he believed Plaintiff was

12  referring to the effects of the pepper spray.  (Camarena Decl.

13  ¶ 11.)  Defendant Salopek also recalled that Plaintiff complained

14  that he was "burning," but that he did not indicate that he was in

15  severe pain.  (Salopek Decl. ¶ 8.)

16     At approximately 1:00 pm, Defendant Celaya asked Defendant

17  Colburn to retrieve a five-gallon bucket from the Work Crew Office.

18  (Colburn Decl. ¶ 3.)  Defendant Colburn filled the bucket with

19  water and brought it outside to Plaintiff, who was kneeling between

20

21  ————————————————

22     [8]Defendants declare that they do not recall Plaintiff
requesting something to put under his knees.  (Camarena Decl. ¶ 11;
Salopek Decl. ¶ 8.)

23

24     [9]Defendants Camarena and Salopek declare that, "at no point
during the decontamination process did [Plaintiff] complain of any
injury or need for medical attention."  (Camarena Decl. ¶ 11;

25  Salopek Decl. ¶ 8.)  Defendant Colburn also declares that Plaintiff
did not request medical attention.  (Colburn Decl. ¶ 4.)

26

27     [10]Other than providing Plaintiff with water, Defendant Colburn
declares that he was not involved in, nor did he observe, any other
portion of the incident.  (Colburn Decl. ¶ 6.)  He also declares

28  that he has never trapped or cooked lobsters and he did not joke
about or compare Plaintiff to a lobster.  (Id. ¶ 7.)

Defendants Camarena and Salopek and did not exhibit signs of distress.  (Id. ¶ 4.)  Defendant Colburn advised Plaintiff that fresh air is the best way to decontaminate and that water provides only temporary relief from OC and might not stop the burning, but Plaintiff insisted that he wanted the water poured over his body. (Id.)  Plaintiff testifies that he had been kneeling for about forty minutes when Defendant Colburn brought a bucket of water outside and slowly poured three gallons over his head in order to "bring [him] back into consciousness."  (Pl.'s Depo. 148-49, 153.) Defendant Colburn then went back inside and came out with another bucket of water, but Plaintiff told him not to pour it over his head because he thought it was just reactivating the chemicals.[11] (Id. at 150.)  Plaintiff requested some water to drink, so Defendant Colburn "poured a little in [his] mouth and he left it at that."  (Id.)  Defendant Colburn declares that he decontaminated Plaintiff with water for about ten minutes, until Plaintiff indicated that he did not need any more water.  (Id. ¶ 5.) Plaintiff recalls being outside for between forty-five minutes and one hour.[12]  (Pl.'s Depo. 153.)

Plaintiff testifies that, for the duration of his decontamination, Defendant Aguirre was standing by the rear exit

---

[11]Defendant Colburn declares that, at Plaintiff's request, he refilled the five-gallon bucket twice and poured an estimated fifteen gallons of water over his body.  (Colburn Decl. ¶ 5.)

[12]Defendant Salopek and Sgt. Mensing declare that Plaintiff was on his knees for decontamination for ten to fifteen minutes. (Salopek Decl. ¶ 8; Mensing Decl. ¶ 8.)  Defendant Camarena declares that Plaintiff was decontaminated for twenty to thirty minutes.  (Camarena Decl. ¶ 11.)

door, observing.[13]   (Pl.'s Depo. 142, 147.)   Plaintiff admits that

Defendants Colburn, Salopek, and Aguirre did not use any physical

force against him on March 10, 2005.   (Id. at 186-87.)

     After decontamination, Plaintiff was escorted inside the

health services annex and placed into a holding cell for about

fifteen more minutes.   (Pl.'s Depo. 159.)   At approximately 1:00

pm, MTA Pulido completed another medical evaluation of Plaintiff,

in order to clear him for release to ad seg; MTA Pulido found no

injuries, and documented his exposure to and decontamination from

OC.[14]   (Pl.'s Decl. Ex. N; Salopek Decl. ¶ 9; Camarena Decl. ¶ 12.)

Plaintiff was then taken to ad seg by Defendants Salopek and

Camarena.   (Pl.'s Depo. 159.)   In ad seg, Plaintiff's cell mate was

Otis Moran.   (Id. 160.)

     A processing report, which was updated "at or near the time of

the event," indicates that Plaintiff was placed in ad seg at 2:05

pm on March 10, 2005.   (Pl.'s Decl. Ex. J.)   At approximately 2:20,

Plaintiff received a notice informing him that his ad seg placement

was due to sexual harassment.   (Id. at 162.)   Later that day, in ad

seg, Plaintiff was observed hitting the door of the cell and

hitting himself on the shoulders.   (Parin Decl. ¶ 5.)

---

[13]Defendants Camarena and Salopek do not remember Defendant
Aguirre being present during the spraying of OC or subsequent
decontamination.   (Camarena Decl. ¶ 11; Salopek Decl. ¶ 8.)
Defendant Aguirre declares that he was neither involved in, nor did
he witness, the incident on March 10, 2005.   (Aguirre Decl. ¶ 7.)
Furthermore, if he had been involved, or witnessed the release of
OC, he would have been required to fill out a Rules Violation
Report or an Incident Report.   (Id. ¶ 8.)   He declares that he did
not draft or assist in drafting any such report.   (Id.)   He declares
that he never interacted with Plaintiff.   (Id. ¶ 5.)

[14]Plaintiff alleges that this document was falsified.   The
Court dismissed Plaintiff's original claim of fraud against MTA
Pulido.   Plaintiff provides no evidence that the document is false.

United States District Court
For the Northern District of California

On March 11, 2005, Plaintiff complained of shoulder pain, skin damage and blistered knees, and he was evaluated by MTA Garcia who found a scratch on Plaintiff's left shoulder, but no redness or swelling and no other injuries. (Lee Decl. Ex. C; Pl.'s Decl. Ex. C-D.) MTA Garcia notified an SVSP nurse about Plaintiff's scratch. On March 16, 2005, Plaintiff was examined by Dr. Bowman who found that his skin, back and shoulder looked normal. (Pl.'s Decl. Ex. D.) Plaintiff also received an X-ray of his left shoulder, and on March 18, 2005, he received the results, which indicated "[n]ormal bone and joint structures." (Lee Decl. Ex. D.) Plaintiff testifies that the pain in his knees subsided within two days and he was never diagnosed with skin cancer. (Pl.'s Depo. 176.)

On June 15, 2007, SVSP Chief Medical Officer Charles Lee, M.D., conducted a physical examination of Plaintiff. (Lee Decl. ¶ 4.) Dr. Lee found no medical evidence of any significant, residual or permanent injury to Plaintiff's shoulder, knees, skin or genitals. (Id.) Dr. Lee observed that Plaintiff was able to move his shoulders normally and had no damage or scarring, and that he did not indicate that he was experiencing pain. (Id. ¶ 4a.) Plaintiff was also able to move his knees normally without pain, and Dr. Lee did not observe any scarring or abnormal coloration on Plaintiff's knees. (Id. ¶ 4b.) Dr. Lee found no evidence of skin damage or skin cancer related to sunburn, nor did he find any residual injury to Plaintiff's genitals from the pepper spray. (Id. ¶¶ 4c-4d.) Dr. Lee also reviewed Plaintiff's medical records and found that the "most serious injury that [Plaintiff] suffered as a result of the March 10, 2005 incident was exposure to the fleeting effects of pepper spray." (Id. ¶ 5.)

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Id. at 324.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).  Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods.  Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).  The moving party may produce evidence negating an essential element of the non-moving party's case, or, after suitable discovery, the moving party may show that the non-moving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.  Id. If the moving party discharges its burden by showing an absence of

14

evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id. If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial. Id. at 1107.

DISCUSSION

I.   Defendant Celaya, Camarena and Salopek's Motion for Summary
     Judgment

Defendants Celaya, Camarena and Salopek move for summary judgment (docket no. 34) on the grounds that there is no genuine issue of material fact regarding Plaintiff's claims of excessive force and deliberate indifference, and that they are entitled to qualified immunity.

United States District Court
For the Northern District of California

A.   Excessive Force Claim

The following allegations form the basis of Plaintiff's excessive force claim against Defendants Celaya, Camarena and Salopek: (1) Defendants dispersed chemical agents into the holding cell where Plaintiff was located, unprovoked; (2) Defendants Camarena and Salopek forced him to touch his genitals with his OC saturated hands during an unclothed body search; (3) Defendant Camarena twisted Plaintiff's wrist and pushed him into a holding cell; and (4) Defendants Camarena and Salopek forced Plaintiff to kneel on asphalt for an hour under the extreme heat of the sun.

In order to state a claim for the use of excessive force in violation of the Eighth Amendment, Plaintiff must allege facts that, if proven, would establish that prison officials applied force "maliciously and sadistically to cause harm," rather than in a good-faith effort to maintain or restore discipline. Hudson v. McMillian, 503 U.S. 1, 6-7 (1992). The extent of injury suffered by an inmate is one of the factors to be considered in determining whether the use of force is wanton and unnecessary. Id. Not every malevolent touch by a prison guard gives rise to a federal cause of action; the Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of physical force. Id. at 9-10. Guards may use force only in proportion to the need in each situation. Spain v. Procunier, 600 F.2d 189, 195 (9th Cir. 1979).

In determining whether the use of force was for the purpose of maintaining or restoring discipline or, rather, for the malicious and sadistic purpose of causing harm, a court may evaluate the need for application of force, the relationship between that need and

United States District Court
For the Northern District of California

the amount of force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. <u>Hudson</u>, 503 U.S. at 7.  However, courts must accord prison administrators wide-ranging deference in the adoption and execution of polices and practices to further institutional order and security.  <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979); <u>Jeffers v. Gomez</u>, 267 F.3d 895, 917 (9th Cir. 2001).

Plaintiff's complaint alleges that he did not provoke the use of OC.  However, he testifies that he refused to obey orders from three different prison officials and that he was rattling his cell door, "irate," and "yelling" at Defendant Celaya prior to being sprayed with OC.  Defendant Camarena ordered Plaintiff to submit to an unclothed body search and Plaintiff refused.  Defendant Camarena repeated the order with an explanation that all inmates are required to submit to an unclothed body search.  Plaintiff refused again, demanding to speak to a superior officer.  When this officer, Sgt. Mensing, arrived and repeated the order, Plaintiff refused and demanded to speak to Defendant Celaya.  Sgt. Mensing retrieved Defendant Celaya, who repeated the order to submit to an unclothed body search.  At this point, Plaintiff began yelling and pushing up against his cell door, causing it to shake and rattle. Defendants were concerned that Plaintiff would either harm himself or break out of his cell and endanger others.  Plaintiff provides no evidence that Defendants applied force maliciously, for the purpose of causing harm.

In the context of Plaintiff's refusal to comply with the direct orders of three SVSP officials, his disorderly behavior, and

United States District Court
For the Northern District of California

the warning that he received, Defendants have demonstrated that Sgt. Mensing released OC into Plaintiff's cell for the purpose of maintaining order and discipline.  Regardless of Defendants' role in Sgt. Mensing's action, they were complying with SVSP policy, which required them to use pepper spray, the lowest level of force, to keep Plaintiff from hurting himself or others.  See Spain v. Procunier, 600 F. 2d 189, 195 (9th Cir. 1979) (where, "after adequate warning," a prisoner acts in such a way to present "a reasonable possibility that slight force will be required," use of chemical spray "may be a legitimate means for preventing small disturbances from becoming dangerous").

In his opposition, Plaintiff no longer contends that the use of pepper spray was unprovoked, but rather, that it was unwarranted because he was not allowed to speak to a prison official of higher authority.  Aside from the fact that Plaintiff was warned that he would be sprayed with OC, to which he replied, "Spray me, because I am not going to strip out," Sgt. Mensing only resorted to use of force--the release the OC chemical spray into Plaintiff's cell-- after Plaintiff refused to comply with the direct orders of three different SVSP officials.  Plaintiff refused an order from Defendant Camarena, a correctional officer, then from Sgt. Mensing, the facility supervisor, then from Defendant Celaya, the supervising facility lieutenant.  Plaintiff specifically requested to speak to Defendant Celaya, but when he did not get what he wanted from Defendant Celaya, he became belligerent and requested an audience with a higher prison official.  Although prison officials are not required to negotiate with inmates who refuse to comply with direct orders, Plaintiff was afforded the opportunity

**United States District Court**
For the Northern District of California

to speak with two officials of higher authority.  Thus, his argument is unavailing.

Plaintiff alleges that Defendants' order to touch his genitals during the unclothed body search, after his hands were "saturated in chemical agents," amounted to cruel and unusual punishment.  At his deposition, Plaintiff did not testify to this fact, and he explained that the standard procedure for an unclothed body search entails lifting ones genitals.  Defendant Salopek stated that, because of the danger posed by contraband hidden in body cavities, inmates must submit to such a search, even if they have been exposed to OC.  The entire search, which included a search of Plaintiff's hair, mouth and feet, took approximately two to three minutes.  Plaintiff does not allege that he informed Defendants that he was in pain.  Further, he fails to show that Defendants intended to cause him harm by ordering him to submit to an unclothed body search.  Defendants ordered the search in compliance with SVSP policy, in order to maintain institutional security.

Plaintiff alleges that, after he was handcuffed and complying with orders, Defendant Camarena used excessive force by attempting to trip him, pushing him into the frame of a holding cell door, and twisting and pulling his wrists.  Plaintiff testifies that, after being ordered to kneel, he went down on his knees before being tripped and that Defendant Camarena pushed him into the cell door for no more than fifteen seconds while he was putting on Plaintiff's leg restraints.  He also testifies that he was escorted outside by Defendants Camarena and Salopek, but that only Defendant Camarena, who was holding Plaintiff's right arm, twisted his wrist and jerked his arm.  Plaintiff admits that Defendant Salopek did

United States District Court
For the Northern District of California

not apply any force that day.  Plaintiff's medical evaluations, prior to, and after the incident indicate the Plaintiff did not sustain any injuries, such as cuts, abrasions, swelling or bruises. Construing Plaintiff's allegations as true, that Defendant Camarena subjected him to "rough handling," the Eighth Amendment does not protect against such <u>de minimis</u> use of physical force.

Plaintiff claims that Defendants Camarena and Salopek subjected him to torture by forcing him to kneel, for forty-five minutes, on hot asphalt, under the "extreme heat" of the sun. Plaintiff claims that Defendants refused his requests for a cloth to put under his knees, resulting in blisters.  The photographic evidence indicates that Plaintiff was kneeling on light colored cement,[15] not asphalt, and Plaintiff testifies that he was kneeling for approximately forty-five minutes.  Defendants declare that they asked Plaintiff to kneel as a safety precaution, based on his previous behavior.  SVSP policy states that forty-five minutes is the amount of time necessary for dissipation of all effects of OC exposure.  Both SVSP policy and the instructions on the canister of OC specify that decontamination is best achieved by exposing the individual to fresh air.  Defendants decontaminated Plaintiff in the manner that they did for the purpose of safely alleviating the effects of the OC spray, in compliance with SVSP policy, and not

_____

[15]Defendants cite <u>Scott v. Harris</u>, 127 S. Ct. 1769, 1776 (2007), for the proposition that, "[w]hen opposing parties tell different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  In <u>Scott</u>, the Court held that a police officer was entitled to summary judgment, based on qualified immunity, in light of video evidence that utterly discredited the plaintiff's claim.  <u>Id.</u>  The photographs in the instant case provide such uncontrovertible evidence about the surface on which Plaintiff was asked to kneel.

United States District Court
For the Northern District of California

for the malicious or sadistic purpose of causing harm.

As with his previous allegations, Plaintiff presents no evidence that he sustained anything more than de minimis injury to his skin or knees as a result of either the "extreme heat" of the sun or the heat of the surface on which he was kneeling.  MTA Pulido's post-decontamination assessment found no injury to Plaintiff's knees or skin.  MTA Garcia, who examined Plaintiff the next day, found no blisters, swelling or redness on his knees, back or shoulder.  Dr. Lee's subsequent physical examination and review of Plaintiff's medical records revealed no lasting injury. Plaintiff's only evidence of injury arising from hot weather is a declaration from Mr. Moran, another inmate, who looked at Plaintiff's back on March 10, 2005, and saw some discoloration of the skin and evidence of sunburn.  (Moran Decl. at 2.)  Further, Plaintiff testified that the pain in his knees subsided after two days and that he was never diagnosed with skin cancer or other skin problems.

Plaintiff fails to establish that Defendants Celaya, Camarena or Salopek applied force in a malicious or sadistic manner or that he suffered more than de minimis injury.  Accordingly, these Defendants are entitled to summary judgment on the excessive force claims as a matter of law.

B.   Deliberate Indifference Claim

Plaintiff's deliberate indifference claim against Defendants Camarena and Salopek stems from the following allegations: (1) they were deliberately indifferent to his needs by not promptly releasing him from the holding cell area to decontaminate him from the effects of OC and by not allowing him to shower after

21

**United States District Court**
For the Northern District of California

being sprayed with OC; (2) they refused medical treatment for his shoulder, which was bruised after he was pushed into the side of a holding cell; and (3) they refused medical treatment for his knees, which blistered when he was forced to kneel during the outdoor decontamination process.

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. Farmer v. Brennan, 511 U.S. 825, 832 (1994). The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. Helling v. McKinney, 509 U.S. 25, 31 (1993).

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104 (1976); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. Id.

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." Id. (citing Estelle, 429 U.S. at 104). The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of

United States District Court
For the Northern District of California

indications that a prisoner has a "serious" need for medical treatment.  Id. at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

A prison official is deliberately indifferent if he or she knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  Farmer, 511 U.S. at 837.  The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference."  Id.  If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.  Gibson v. County of Washoe, 290 F.3d 1175, 1188 (9th Cir. 2002).

In order for deliberate indifference to be established, therefore, there must be a purposeful act or failure to act on the part of the defendant and resulting harm.  McGuckin, 974 F.2d at 1060; Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.1985).  A finding that the defendant's activities resulted in "substantial" harm to the prisoner is not necessary, however.  Neither a finding that a defendant's actions are egregious nor that they resulted in significant injury to a prisoner is required to establish a violation of the prisoner's federal constitutional rights, McGuckin, 974 F.2d at 1060, 1061, but the existence of serious harm tends to support an inmate's deliberate indifference claims, Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

Once the prerequisites are met, it is up to the fact-finder to determine whether the defendant exhibited deliberate indifference.

23

United States District Court
For the Northern District of California

Such indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provide medical care. McGuckin, 974 F.2d at 1062 (delay of seven months in providing medical care during which medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim).

Plaintiff asserts that the effects of exposure to OC, a bruised shoulder, and blistered knees amounted to serious medical needs. After Plaintiff was decontaminated, he was examined by MTA Pulido, who listed no evidence of injury, and who documented Plaintiff's decontamination from OC spray. Dr. Lee's 2007 physical examination found no long-term or lasting skin, knee, shoulder or OC related injuries. The only medical evidence of an injury is a March 11, 2005 report of a scratch on Plaintiff's shoulder, unaccompanied by bruising or swelling. An X-ray of Plaintiff's shoulder, taken on March 12, 2005, two days after the incident, revealed no bone or joint injury. Therefore, Plaintiff has failed to show that he suffered from a serious medical need within the meaning of the Eighth Amendment. However, had Plaintiff's medical needs been serious, he would need to show that Defendants were deliberately indifferent.

Plaintiff argues that he was subjected to a period of deliberate delay in addressing his medical needs after he was exposed to OC, because Defendants Salopek and Camarena did not immediately release him from his holding cell. Five minutes elapsed between the time Plaintiff was sprayed and the time Defendants opened his cell door to perform a strip search.

United States District Court
For the Northern District of California

Plaintiff claims that, while coughing and choking, he had to twice repeat the affirmation that he was ready to comply with the unclothed body search, before he was released.  However, he also testifies that he was trying to be "macho" so purposely did not indicate that he would comply, until he succumbed to coughing.  Immediately after the search, Defendants Salopek and Camarena took Plaintiff outside to be decontaminated from the effects of the OC spray.  Viewing the evidence in the light most favorable to Plaintiff, and assuming that it took five minutes to release him from the cell, Defendants' delay does not amount to deliberate indifference to his medical need.

Plaintiff claims that Defendants Salopek and Camarena were deliberately indifferent to his need to be decontaminated from the effects of the OC spray by taking him outside, rather than allowing him to shower.  Defendants placed Plaintiff outside to decontaminate from the effects of the spray based on both SVSP policy and the OC manufacturer's instructions for decontamination that prescribe exposure to fresh air as the best method for decontamination.  Plaintiff complained that he was "burning" and admits that he received a gentle dousing with water.  He admits that he then refused a second dousing because the water only reactivated the "chemical agents" in the OC spray.  Plaintiff does not say that he requested a shower.  The holding cell facility did not have a shower, and Defendants were concerned that placing Plaintiff in a locked shower would only re-instigate his previous disruptive behavior.  The evidence indicates that Defendants were not deliberately indifferent by decontaminating Plaintiff by exposing him to fresh air in an outdoor area.

United States District Court
For the Northern District of California

Plaintiff asserts that Defendants were deliberately indifferent by denying access to medical care for his bruised shoulder.  Accepting, for the purposes of this motion, that Plaintiff asked to see an MTA, and Defendants did not retrieve one while Plaintiff was undergoing decontamination in the outdoor area, he received a follow up examination after decontamination.  MTA Pulido conducted a medical evaluation of Plaintiff at approximately 1:00 pm, medically clearing him to enter ad seg.  Another MTA examined Plaintiff on March 11, 2005, noting a "small abrasion" on Plaintiff's right shoulder, but no redness or swelling.  As a precaution, however, Plaintiff received an X-ray on March 16, 2005, which found nothing wrong with his shoulder.  The undisputed evidence indicates that Plaintiff was provided ample access to medical care for his shoulder.

Plaintiff argues that Defendants were deliberately indifferent to his blistered knees by not providing him a cloth to kneel on.  MTA Pulado, who conducted a medical evaluation after Plaintiff's decontamination, did not document any blisters.  Plaintiff does not claim that he requested, or was denied, medical assistance regarding his knees.  He also testifies that any pain in his knees subsided after two days.  That he was not given a cloth to kneel on, and as a result may have experienced some discomfort, does not rise to the level of deliberate indifference.

Consequently, Defendants Salopek and Camarena are entitled to summary judgment on Plaintiff's deliberate indifference claim.

C.    Qualified Immunity Defense

In the alternative, Defendants Celaya, Salopek and Camarena assert that they are entitled to summary judgment based on

26

qualified immunity.

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The rule of qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'"  Saucier v. Katz, 533 U.S. 194, 202 (2001) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  A defendant may have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation.  Id.  "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful."  Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir. 1991).

To determine whether a defendant is entitled to qualified immunity, the court must engage in the following inquiries.  At the outset, the court must determine whether the plaintiff has alleged the deprivation of an actual constitutional right.  Conn v. Gabbert, 526 U.S. 286, 290 (1999).  In other words, the court must ask, "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Brosseau v. Haugen, 543 U.S. 194, 197 (2004); Saucier, 533 U.S. at 201.  If this inquiry yields a positive answer, then the court proceeds to determine if the right was "clearly established."  Id.

United States District Court
For the Northern District of California

27

**United States District Court**
For the Northern District of California

The inquiry as to whether the right at issue was clearly established must be made in light of the specific context of the case, not as a broad general proposition. <u>Saucier</u>, 533 U.S. at 202. "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002). As the Supreme Court has explained, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." <u>Id.</u> at 753. The plaintiff bears the burden of proving the existence of a clearly established right at the time of the allegedly impermissible conduct. <u>Maraziti v. First Interstate Bank</u>, 953 F.2d 520, 523 (9th Cir. 1992).

If the law is determined to be clearly established, the next question is whether, under that law, a reasonable official could have believed his or her conduct was lawful in the situation confronted. <u>Act Up!/Portland v. Bagley</u>, 988 F.2d 868, 871-72 (9th Cir. 1993). If the law did not put the officer on notice that his or her conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. <u>Saucier</u>, 533 U.S. at 202. Therefore, qualified immunity shields an officer from suit when he or she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances he or she confronted. <u>Id.</u> at 206. The defendant bears the burden of establishing that his or her actions were reasonable, even though he or she violated the plaintiff's constitutional rights. <u>Doe v. Petaluma City School Dist.</u>, 54 F.3d 1447, 1450 (9th Cir. 1995).

**United States District Court**
For the Northern District of California

Construing the evidence in Plaintiff's favor, the Court has found that Defendants' actions did not amount to cruel and unusual punishment. Even if Defendants had violated Plaintiff's Eighth Amendment rights, though, they are entitled to qualified immunity because they have produced sufficient evidence to show that they could have believed that their actions were reasonable under the circumstances of each claim as outlined below.

Defendants Celaya, Salopek and Camarena did not act unreasonably in condoning Sgt. Mensing's act of spraying Plaintiff with a canister of OC. Plaintiff has a history of sexual misconduct at SVSP, and on the morning of the incident, he sexually harassed an SVSP nurse. In accord with SVSP policy, Sgt. Mensing ordered Defendant Camarena to escort Plaintiff from his cell to the Program Office, in preparation for placing Plaintiff in ad seg, pending a review of the incident. Defendant Camarena also followed SVSP policy by placing Plaintiff in a holding cell, in order to process him into the ad seg facility. Defendants Celaya and Camarena and Sgt. Mensing then followed procedure by ordering Plaintiff to submit to an unclothed body search. Based on Plaintiff's ensuing disruptive and physically harmful behavior, reasonable prison officials could have believed that the decision to release OC spray was warranted.

Defendant Camarena did not act unreasonably during the process of shackling Plaintiff and moving him from the holding cell to the outside area for decontamination. Even if Defendant Camarena subjected Plaintiff to rough handling, the circumstances were such that a reasonably prudent officer could have acted similarly. Just minutes before, Plaintiff had been yelling and throwing himself

**United States District Court**
For the Northern District of California

against his cell wall while refusing to comply with orders.
Defendant Camarena's possible de minimis application of force, in
placing Plaintiff in leg restraints and escorting him outside, was
not clearly unlawful.  Plaintiff provides no evidence that he
sustained any injury to his wrist or more than a minor scratch on
his shoulder.

Lastly, Defendants Camarena and Salopek acted reasonably by
bringing Plaintiff to an outdoor area to decontaminate from the
effects of OC spray and by having him kneel.  Defendants followed
SVSP's decontamination policy by exposing Plaintiff to fresh air.
The holding cell area did not have a shower and it was contaminated
with OC.  Reasonable officers in Defendants' position would have
decided to take Plaintiff outside to decontaminate.  Defendants'
decision to have Plaintiff kneel was not unreasonable, based on his
previous combative behavior.  Both Defendants also acted reasonably
in construing Plaintiff's complaints of "burning" as stemming from
the effects of the OC.  Even if a constitutional violation had
occurred, it would not have been clear to a reasonable officer in
Defendants' position that the conduct violated the prohibition
against excessive force or deliberate indifference to a serious
medical need.

Consequently, Defendants Celaya, Camarena and Salopek are
entitled to qualified immunity.  For this and the foregoing
reasons, the Court GRANTS Defendants' motion for summary judgment.

II.   Defendant Colburn and Aguirre's Motion for Summary Judgment

Defendants Colburn and Aguirre move for summary judgment
(docket no. 81) on the grounds that there is no genuine issue of
material fact and they are entitled to qualified immunity.

**United States District Court**
For the Northern District of California

A.    Excessive Force Claim

Plaintiff's sole allegation against Defendant Aguirre is that he was standing by a rear exit door in the outdoor area where Plaintiff was decontaminated.  Plaintiff does not allege that Defendant Aguirre engaged in unlawful conduct, and thus, he fails to state a claim against him.

Plaintiff's only allegation against Defendant Colburn is that he offered him water during the decontamination process.  Plaintiff complained that he was "burning," so Defendant Colburn slowly poured approximately three gallons of water over Plaintiff's head.  After the first bucket was empty, he retrieved another and offered to pour it over Plaintiff's head.  Plaintiff refused, asking instead for a drink of water, and Defendant Colburn gave him one.

Plaintiff admits that neither Defendant Colburn nor Aguirre applied force against him on March 10, 2005.  Thus, Defendants Aguirre and Colburn are entitled to summary judgment on Plaintiff's excessive force claim.

B.    Deliberate Indifference Claim

Plaintiff does not allege any purposeful act or failure to act by Defendant Aguirre and thus, he fails to state a deliberate indifference claim against him.  Plaintiff argues that Defendant Colburn was deliberately indifferent because he poured some water on his head, in order to prolong his pain by reactivating the "chemical agents" in the OC spray.

As explained above, Plaintiff suffered no lasting injury from the effects of OC spray.  The effects of OC spray are fully alleviated in forty-five minutes.  Forty-five minutes is the amount of time that Plaintiff testifies he was placed outside for the

decontamination process.  Plaintiff states that he asked for water. Even if the water that Defendant Colburn subsequently poured over Plaintiff's head did renew the burning sensation caused by the OC spray, Plaintiff has failed to show that Defendant Colburn acted with the intent of causing pain.  Plaintiff does not allege that he requested medical assistance from Defendant Colburn.  Further, the fact that Defendant Colburn did not continue to pour water over Plaintiff's head, after Plaintiff informed him to stop, indicates that he did not intend to purposefully prolong Plaintiff's pain.

Accordingly, Defendants Aguirre and Colburn are entitled to summary judgment on Plaintiff's deliberate indifference claim.

C.   Qualified Immunity Defense

Plaintiff fails to state a claim against Defendant Aguirre, and he has not established that Defendant Colburn's conduct amounted to a violation of the constitutional prohibition on cruel and unusual punishment.  Even if an Eighth Amendment violation had occurred, Defendant Colburn acted reasonably under the circumstances, as discussed above.

Accordingly, Defendants Colburn and Aguirre are entitled to qualified immunity.  For the reasons discussed above, the Court GRANTS Defendants' motion for summary judgment.

CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.   The motion for summary judgment brought by Defendants Celaya, Camarena and Salopek (docket no. 34) is GRANTED.

2.   The motion for summary judgment brought by Defendants Colburn and Aguirre (docket no. 81) is GRANTED.

3.   This Order terminates Docket nos. 34 and 81.

         4.    The Court shall enter judgment and close the file.   Each
party shall bear his own costs.

         IT IS SO ORDERED.


Dated:   4/11/08
                                    _____
                                    CLAUDIA WILKEN
                                    United States District Judge

1

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

2

3

ANDRE L. HART,

4                              Case Number: CV06-02519 CW

                Plaintiff,

5                              **CERTIFICATE OF SERVICE**

    v.

6

J. CELAYA et al,

7

                Defendant.

8    —————————————————/

9    I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court,
10   Northern District of California.

11   That on April 11, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said
     copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
12   envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located
     in the Clerk's office.

13

14

15   Andre L. Hart #:D-18158
     Substance Abuse Treatment Facility
16   C6-124
     P.O. Box 7100
17   Corcoran,  CA 93212

18   Jonathan Lloyd Wolff
     CA State Attorney General's Office
19   455 Golden Gate Avenue Ste 11000
     San Francisco,  CA 94102-7004

20   Dated: April 11, 2008

21                              Richard W. Wieking, Clerk
                               By: Sheilah Cahill, Deputy Clerk

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California